UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

FRANK DINSMORE,

Plaintiff,

v.

WASHBURN & DOUGHTY ASSOCIATES, INC.,

Defendant.

Civil Action No.

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, Frank Dinsmore, by and through undersigned counsel, and complains against the Defendant, Washburn & Doughty Associates, Inc., (Washburn & Doughty), as follows:

## JURISDICTION AND PARTIES

1. This action arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 *et seq*. and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq*.

2. Mr. Dinsmore is a United States citizen residing in the City of Augusta, County of Kennebec, State of Maine.

3. Washburn & Doughty is a Maine business corporation with its principal place of business (a shipyard) in the Village of East Boothbay, County of Lincoln, State of Maine.

4. Washburn & Doughty had 15 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

5. Washburn & Doughty had more than 100 employees in 2018 and 2019.

6. This Court has subject matter jurisdiction over Mr. Dinsmore's federal and state claims pursuant to 28 U.S.C. §§ 1331and 1367.

7. On or about April 24, 2019, Mr. Dinsmore filed a timely Complaint of Discrimination with the Maine Human Rights Commission ("MHRC") and Equal Employment Opportunity Commission ("EEOC") against Washburn & Doughty alleging unlawful disability discrimination, retaliation, and whistleblower retaliation.

8. On or about January 8, 2020, the MHRC issued a Notice of Right to Sue with respect to Mr. Dinsmore's MHRA and WPA claims.

9. On or about January 13, 2020, the EEOC issued a Notice of Right to Sue with respect to Mr. Dinsmore's ADA claims.

10. Mr. Dinsmore has exhausted his administrative remedies with respect to all claims set forth in this Complaint.

FACTUAL ALLEGATIONS

11. On November 5, 2018, Mr. Dinsmore applied for a welding job at the Washburn & Doughty shipyard by filling out an online application.

12. On November 6, 2018, Mr. Dinsmore was invited to interview for the job the following day.

13. On November 7, 2018, Mr. Dinsmore went to the Human Resources (HR) office at the shipyard and filled out a paper application.

14. After that, Mr. Dinsmore met with welding supervisor Mike Fitzgibbons for an interview.

15. Mr. Fitzgibbons told Mr. Dinsmore that he was hired.

16. Mr. Fitzgibbons told Mr. Dinsmore that his starting pay would be $21.00 per hour, full time, starting on the Monday after Thanksgiving (November 26, 2018).

17. Mr. Dinsmore accepted the job offer and then went back to HR to finish filling out the paper application.

18. Sue Morgan in HR told Mr. Dinsmore that he needed to go to Workplace Health for a physical.

19. The physical required by Washburn & Doughty was a post-offer, pre-employment medical examination for purposes of 42 U.S.C. § 12112(d)(3) and 5 M.R.S. § 4572(2)(C).

20. Mr. Dinsmore told Ms. Morgan that he had difficulty with pulmonary function tests (PFTs).

21. Ms. Morgan told Mr. Dinsmore that she would email directions and the time for an appointment at Workplace Health to him. Mr. Dinsmore received her email later that afternoon.

22. On November 12, 2018, Mr. Dinsmore went for the physical at Workplace Health, which included a PFT.

23. Workplace Health told Mr. Dinsmore that his PFT results were insufficient for respirator clearance.

24. Specifically, Mr. Dinsmore's paperwork indicated:

> The results may not adversely affect your ability to perform your job. However, it is recommended that you seek follow-up medical care from your family physician to further evaluate the above findings. We will forward copies of your test results to your family physician if you so request and the required release of medical information form has been signed.
>
> Pulmonary function test at exam today were not adequate for respirator clearance. Please evaluate and provide respirator clearance for patient with or without restrictions.

25. Workplace Health told Mr. Dinsmore that he would need to get permission from his primary care physician (PCP) for respirator use.

26. On November 13, 2018, Mr. Dinsmore called Ms. Morgan and told her about his PFT results and asked her if passing the PFT was mandatory for getting hired by Washburn & Doughty.

27. The information provided by Mr. Dinsmore to Ms. Morgan on November 13, 2018 was protected by the confidentiality provisions of the ADA and MHRA.  42 U.S.C. § 12112(d)(3)  and 5 M.R.S. § 4572(2)(C).

28. The ADA and MHRA require that employers treat information obtained in a post-offer medical examination as a confidential medical record and only permit the disclosure of this information as follows:

   (a) Supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations;

   (b) First aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment; and

   (c) Government officials investigating compliance with this Chapter [Act] are provided relevant information on request.

29. Mr. Dinsmore asked Ms. Morgan if getting permission from his PCP would enable him to start working, as he had been told by Workplace Health.

30. Ms. Morgan said she would check and get back to Mr. Dinsmore.

31. On November 14, 2018, Ms. Morgan emailed Mr. Dinsmore and said that he would not be able to start working until they received clearance from his PCP.

32. Mr. Dinsmore took some time to consider his options. He was offered a job with Cianbro but the job was 75 miles from his home, so he turned it down.

33. On December 12, 2018, Mr. Dinsmore called Washburn & Doughty and asked Mr. Fitzgibbons if the welder job was still open and if there were other job opportunities available.

34. Mr. Fitzgibbons said the welder job was still open and that they were also hiring shipfitters.

35. Upon information and belief, between January and April 2019, Washburn & Doughty hired seven shipfitters. Two of them were fired in May 2019, and two more were hired in May 2019.

36. Shipfitters tack, weld, and align according to blueprints the basic elements of the fabrication. Welders simply weld components according to the symbol on the blueprint. Shipfitters and welders are both exposed to welding smoke; welders are exposed to a somewhat greater extent.

37. Given Mr. Dinsmore's skills and ability in creating and interpreting blueprints and fabrication drawings, he came to an agreement with Mr. Fitzgibbons that Mr. Dinsmore's skills might be better utilized as a shipfitter.

38. Mr. Dinsmore told Mr. Fitzgibbons that he would work as a welder or as a shipfitter.

39. Mr. Fitzgibbons told Mr. Dinsmore that the company needed shipfitters more than they needed welders at the moment and that if Mr. Dinsmore was cleared by his PCP, he could start working.

40. During the phone conversation with Mr. Fitzgibbons on December 12, 2018, Mr. Dinsmore may have said, while discussing his qualifications to be a shipfitter, something to the effect that if he was a fitter, there would be less time under the welder's hood and less "smoke."

41. At no time during any of Mr. Dinsmore's discussions with Mr. Fitzgibbons or anyone else did he declare his unwillingness to work as a welder.

42. Washburn & Doughty has employed at least one employee who did both jobs, shipfitter and welder. That employee was hired on July 24, 2018 and fired for no call/no show on August 23, 2018.

43. On December 14, 2018, Mr. Dinsmore had a chest x-ray.

44. Washburn & Doughty did not pay for Mr. Dinsmore's x-ray as required by OSHA regulations.

45. On December 18, 2018, the nurse told Mr. Dinsmore that his x-ray was normal.

46. On December 14, 2018 Mr. Dinsmore passed on the information about the results of his chest x-ray to Ms. Morgan at Washburn & Doughty.

47. Mr. Dinsmore asked Ms. Morgan if there was a form that needed to be filled out by his PCP.

48. Ms. Morgan told Mr. Dinsmore she didn't know because she had not encountered this situation before. Ms. Morgan told Mr. Dinsmore to speak to the Head of Security and Maintenance, Tom Adams. She transferred Mr. Dinsmore's call to Mr. Adams's line but no one answered.

49. The information provided by Mr. Dinsmore to Ms. Morgan on December 14, 2018 was protected medical information for purposes of the ADA and MHRA.

50. Mr. Dinsmore left a message for Mr. Adams explaining his situation and left his phone number. No one called him back.

51. The information provided by Mr. Dinsmore to Ms. Morgan on December 14, 2018 was protected medical information for purposes of the ADA and MHRA.

52. Requiring Mr. Dinsmore to share his protected medical information with Mr. Adams constituted a violation of the confidentiality provisions of the ADA and MHRA.

53. On December 18, 2018 at 11:53 AM, Ms. Morgan sent an email to Mr. Adams, Head of Operations Chris Teel, and Mr. Fitzgibbons that read:

> From: Susan Morgan
> Sent: Tuesday, December 18, 2018 11:53 AM
> To: Tom Adams; Chris Teel; Mike Fitzgibbons
> Subject: Frank Dinsmore
>
> Hi there: Frank Dinsmore called this morning. He had applied for a job, and we had offered him one for welding. It looks like he passed the fit test, but it said he needs to get clearance from PCP for respirator use. He just had a chest x-ray done. He wanted to know if there were any other jobs he could do? He was going to leave a message on Tom's voice mail today. So, I'm not sure what to tell him.
> Thanks!
> Sue

54. Ms. Morgan's email violated Mr. Dinsmore's right to medical confidentiality under the MHRA and ADA by giving Mr. Adams, Mr. Teel and Mr. Fitzgibbons information about Mr. Dinsmore's medical condition and/or medical history. The only information that can be shared from a post-offer medical examination with supervisors and managers are "necessary restrictions on work or duties of the employee and necessary accommodations". Ms. Morgan's email provided additional information including details regarding Mr. Dinsmore's medical condition, the results of his test, and the fact that he had a chest-x-ray.

55. Mr. Adams replied to Ms. Morgan's email, "I have turned this over to Matt Maddox. Thanks."

56. Mr. Maddox is the Chief Financial Officer for Washburn & Doughty and was apparently consulted by Mr. Teel during the hiring process.

57. Sharing Mr. Dinsmore's confidential medical information with Mr. Maddox also violated the confidentiality provisions of the ADA and MHRA.

58. Mr. Teel replied to Ms. Morgan's email, as follows:

> From: Chris Teel <email address omitted>

Sent: Tuesday, December 18, 2018 3:40 PM
To: Tom Adams <email address omitted>
Cc: Susan Morgan <email address omitted>; Mike Fitzgibbons <email address omitted>
Subject: Re: Frank Dinsmore

We should not hire a person that could present the company with a liability. One condition of employment is passing the fit test and pulmonary function test.

I would vote to decline hiring this person.

Sent from myiPhone

59. Mr. Teel's email highlights the reasons that the ADA and MHRA require employers to treat information from a medical examination as a confidential medical record and prevent this information from being provided to supervisors and managers, especially those with the power to hire and fire.

60. Mr. Teel made a decision about terminating Mr. Dinsmore based upon unfounded concerns regarding Mr. Dinsmore and his medical condition.

61. Mr. Teel regarded Mr. Dinsmore as a person with an impairment and disability that rendered him an unsuitable candidate for any position.

62. If Washburn & Doughty had followed the confidentiality provision of the ADA and MHRA then its managers would not have known about Mr. Dinsmore's medical condition and would not have discriminated against Mr. Dinsmore.

63. Mr. Dinsmore was unaware of Mr. Teel's email or animus toward him at the time.

64. On December 19, 2018, Mr. Dinsmore called and left another message for Mr. Adams.

65. Later that day, Mr. Dinsmore had an office visit with his PCP and was cleared for unconditional respirator use.

66. Mr. Dinsmore was able to perform the duties of the welder and shipfitter positions and to perform them safely and the objective medical information available at the time of the events in question reflected as much.

67. Washburn & Doughty did not pay for the office visit as required by OSHA regulations.

68. Mr. Dinsmore called and informed Ms. Morgan that he was cleared and got the Washburn & Doughty fax number from her.

69. Mr. Dinsmore gave the fax number to his PCP.

70. On December 20, 2018, the doctor's office faxed Mr. Dinsmore's clearance for unconditional respirator use to Washburn & Doughty.

71. On December 20, 2018, Mr. Dinsmore called Washburn & Doughty and asked to speak to Mr. Fitzgibbons about a start date. He was told that Mr. Fitzgibbons was out and that he would need to speak to Mr. Teel.

72. When Mr. Dinsmore spoke to Mr. Teel, Mr. Teel said that Mr. Dinsmore would be starting work after the Christmas holiday. Mr. Teel told Mr. Dinsmore that Mr. Fitzgibbons was out of work due to family health issues and that a launch was scheduled for the following week, so it was better to wait until after Christmas.

73. Mr. Dinsmore asked Mr. Teel what he would need to bring with him on his first day of work.

74. Mr. Teel told Mr. Dinsmore that he would need to bring a welding hood and some welding gloves.

75. Mr. Dinsmore purchased a new welding hood from Tractor Supply the following day, December 21, 2018.

76. On December 22, 2018, Mr. Dinsmore sent an email to Ms. Morgan asking her to let him know if she did not get the letter from his PCP clearing him for respirator use. She did not respond.

77. Mr. Dinsmore waited until after Christmas, expecting to hear from Mr. Teel about his start date.

78. On December 28, 2018, Mr. Dinsmore called Mr. Teel about a start date. No one answered the phone. Mr. Dinsmore left a message asking for a call back.

79. On December 31, 2018, Mr. Dinsmore called Mr. Teel again about a start date. No one answered the phone. Mr. Dinsmore left a message asking for a call back.

80. On January 2, 2019, Mr. Dinsmore called Mr. Teel about a start date. No one answered the phone. Mr. Dinsmore left a message.

81. Mr. Dinsmore was in the Wiscasset area with his girlfriend and decided to go to the shipyard in person to speak to Mr. Teel in person.

82. When Mr. Dinsmore got to the shipyard at about 9 AM, he spoke to two female office workers. They told him that things had been crazy in the last few days and that Mr. Teel was not available because he was in a production meeting.

83. Mr. Dinsmore explained that he was trying to find out if he was going to start working that week or at some other time in the near future.

84. The office staff apologized for the lack of communication and told Mr. Dinsmore that they would be sure to have Mr. Teel call him that day.

85. Mr. Dinsmore’s conversation with the office staff was cordial.

86. Mr. Teel did not call Mr. Dinsmore that day, as promised.

87. Mr. Dinsmore did, however, receive a call from a nurse at his PCP's office. The nurse told Mr. Dinsmore that the PCP's office received a call from Washburn & Doughty questioning Mr. Dinsmore's fitness for respirator use. The nurse wanted to know if it was okay for her to tell Washburn & Doughty that he was released for unconditional respirator use. The nurse told Mr. Dinsmore it was standard procedure to check with the patient before discussing health issues over the phone.

88. Mr. Dinsmore said yes, that it was okay, but wondered why Washburn & Doughty was asking the question given that a letter to that effect had already been faxed to the company.

89. Mr. Dinsmore learned from Washburn & Doughty's submission to the MHRC that Mr. Teel was the one who called Mr. Doughty's PCP.

90. It was inappropriate for Mr. Teel to be seeking information from Mr. Dinsmore's physician. Mr. Teel's seeking and obtaining additional information regarding Mr. Dinsmore's medical condition violated the ADA and MHRA.

91. Mr. Teel's actions evidence a skepticism on his part with regard to Mr. Dinsmore's ability to perform the jobs at Washburn & Doughty.

92. Mr. Teel sent an email to Ms. Morgan, with copies to Dana Ingalls, Scott Baldwin, Mr. Fitzgibbons and Mr. Adams, stating that he "just confirmed with the doctors office that he has no restrictions and can wear a respirator with no limitations." He added, "Just need to confirm with Mike [Fitzgibbons] and Scott [Baldwin] that he [Mr. Dinsmore] is a solid candidate to hire."

93. Plaintiff does not know who Dana Ingalls or Scott Baldwin are or what role they played in employment decisions involving Mr. Dinsmore. Mr. Teel's sharing of Mr. Dinsmore's

confidential medical information in this email constituted another violation of the ADA and MHRA.

94. On Thursday, January 3, 2019, Mr. Dinsmore called Mr. Teel to ask about his start date. No one answered the phone. Mr. Dinsmore left a message.

95. Mr. Dinsmore also called Ms. Morgan on January 3, 2019. She told him that Mr. Teel was planning on giving him a call and that he had probably been very busy.

96. On Friday, January 4, 2019, Mr. Dinsmore called Mr. Teel about coming to work. No one answered the phone. Mr. Dinsmore left a message.

97. Mr. Dinsmore called back and talked to one of the office staff who was there when he visited Washburn & Doughty on January 2, 2019. Mr. Dinsmore explained that he had not received a call back as promised.

98. The staff member told Mr. Dinsmore that he should "probably start to look for another job."

99. Mr. Dinsmore doesn't know if the staff member meant to be flippant or rude. He was frustrated and upset by her comment and explained that he had already paid out of his own pocket to get the tests and doctor's approval that he had been told he needed in order to start work. The line went dead while Mr. Dinsmore was in the middle of his explanation.

100. Mr. Dinsmore called back a few minutes later and continued the conversation with the staff member in a cordial manner.

101. Mr. Dinsmore told the staff member that all he wanted was for Mr. Teel to call back and let him know if he had a job or not. Mr. Dinsmore explained that he had left several messages and done everything he was told he needed to do and that at least he deserved a call back.

102. The staff member told Mr. Dinsmore she would have Mr. Teel return his call. They ended the call on good terms.

103. Mr. Teel finally called Mr. Dinsmore a couple hours later.

104. Mr. Dinsmore asked Mr. Teel if he was going to start work the following week.

105. Mr. Teel told Mr. Dinsmore he had concerns about the failed PFT.

106. Mr. Teel's stated concerns about Mr. Dinsmore's PFT were not justified given that the doctor's office faxed a document to Washburn & Doughty stating that Mr. Dinsmore was cleared for unconditional respirator, and given that Mr. Teel called Mr. Dinsmore's doctor's office and was told the same thing directly.

107. Mr. Teel also told Mr. Dinsmore that he had concerns about Mr. Doughty's (alleged) unwillingness to work around a lot of smoke.

108. Mr. Dinsmore told Mr. Teel that he had done everything he was told he needed to do to start work. Mr. Dinsmore asked Mr. Teel directly if he had the job or not.

109. Mr. Teel accused Mr. Dinsmore of being rude to the office staff and then said that given Mr. Dinsmore's PFT results, he would not be able to use him as a welder.

110. Mr. Teel's statement is an admission and direct evidence that Washburn & Doughty discriminated against him based on perceived disability with regard to the welder position.

111. Mr. Dinsmore asked Mr. Teel about employment as a shipfitter and told him that Mr. Fitzgibbons had said they needed shipfitters more than welders.

112. Mr. Teel told Mr. Dinsmore that Mr. Fitzgibbons did not have the authority to hire shipfitters.

113. Mr. Teel, who probably did have authority to hire shipfitters, refused to hire Mr. Dinsmore in that capacity.

114. Washburn & Doughty's reasons for refusing to employ Mr. Dinsmore as a shipfitter were untrue and pretexts for disability discrimination.

115. Mr. Dinsmore told Mr. Teel again that he had done everything that Washburn & Doughty had said he needed to do to keep his end of the employment agreement and get hired as a welder. Mr. Dinsmore told Mr. Teel that he would pursue the matter with a lawyer.

116. Washburn & Doughty offered the MHRC two reasons for not employing Mr. Dinsmore as a welder or shipfitter.

117. Washburn & Doughty did not disclose to the MHRC who made the employment decisions involving Mr. Dinsmore, when the decisions were made, or how the decisions were made.

118. The stated reasons are false and a pretext for disability discrimination.

**Mr. Dinsmore was not rude or unprofessional and he was not fired for that reason**

119. Washburn & Doughty claims that Mr. Dinsmore left gruff voicemails for Mr. Teel, Mr. Adams, and others.

120. This is not true.

121. Washburn & Doughty has, or had, possession of Mr. Dinsmore's voicemails and did not provide them to the MHRC.

122. Mr. Dinsmore's own email communications show that Mr. Dinsmore was always polite and respectful.

123. Ms. Morgan's email communications show that Mr. Dinsmore was courteous. Ms. Morgan sent emails to other managers on December 18, 2018 and January 3, 2019. In both

emails, she had just gotten off the phone with Mr. Dinsmore. She did not report that Mr. Dinsmore was disrespectful, rude, or unprofessional.

124. In none of the internal emails between Washburn & Doughty employees discussing Mr. Dinsmore was there any mention of any combativeness or unprofessionalism.

125. Washburn & Doughty told the MHRC that at one point, Mr. Dinsmore was so rude that an administrator had to hang up the phone on him.

126. As explained above, the employee that Mr. Dinsmore spoke to on January 4, 2019 told Mr. Dinsmore that he should "probably start to look for another job."

127. In hindsight, that employee probably knew that Mr. Teel was going to call Mr. Dinsmore and fire him.

128. Mr. Dinsmore did not know that Washburn & Doughty was going to renege on its employment offer at the time he spoke to the office employee and was understandably upset about her comment.

129. The decision to fire Mr. Dinsmore had likely already been made by the time Mr. Dinsmore spoke to the employee he was upset with.

130. Nonetheless, Mr. Dinsmore acted appropriately and did not yell or swear.

**Mr. Dinsmore did not say he did not want to be around welding smoke**

131. Washburn & Doughty claims that Mr. Dinsmore was fired/not hired because he said he did not want to be around welding smoke.

132. This claim is false, and does not make sense.

133. Mr. Dinsmore would not have pursued employment as a welder or shipfitter with Washburn & Doughty as he did not want to be around welding smoke.

134. Mr. Dinsmore would not have purchased a welding hood on December 21, 2018 if he was not willing to work around welding smoke.

135. Mr. Dinsmore's conversations with Mr. Fitzgibbons and Ms. Morgan about the option of working as a shipfitter would have been viewed in a favorable light if Mr. Dinsmore was not perceived as disabled.

136. Most employers value employees who have a wide range of skills, like Mr. Dinsmore.

137. After Washburn & Doughty discriminated and retaliated against Mr. Dinsmore, his search for employment included welder jobs.

138. Mr. Dinsmore has a disability as defined by the ADA, 42 U.S.C. § 12102(1)(c), in that he was regarded as having or regarded as likely to develop a pulmonary impairment that substantially limited the major life activities of breathing and working.

139. Mr. Dinsmore has a disability as defined by the MHRA, 5 M.R.S. § 4553(1)(D), in that he was regarded as having or likely to develop a pulmonary impairment that (a) substantially limited the major life activities of breathing and working and/or (b) a pulmonary impairment that significantly impaired his physical health.

140. Washburn & Doughty violated the MHRA and ADA by repeatedly disclosing information from Mr. Dinsmore's protected post-offer medical examination in violation of the confidentiality provisions of the ADA and MHRA.  42 U.S.C. § 12112(d)(3)  and 5 M.R.S. § 4572(2)(C).

141. Washburn & Doughty's violation of the confidentiality provisions of the ADA and MHRA proximately caused Mr. Dinsmore's discharge from employment.

142. Washburn & Doughty discharged Mr. Dinsmore or otherwise discriminated against him by refusing to let him start working as a welder after hiring him for the job, because of disability discrimination in violation of the MHRA, 5 M.R.S. § 4572(1)(A) and the ADA, 42 U.S.C. § 12112(a).

143. Washburn & Doughty refused to hire Mr. Dinsmore as a shipfitter because of disability discrimination in violation of the MHRA, 5 M.R.S. § 4572(1)(A) and the ADA, 42 U.S.C. § 12112(a).

144. Washburn & Doughty violated Mr. Dinsmore's rights by using the results of a medical examination to deny him a job in violation of the MHRA, 5 M.R.S. § 4572(2)(C)(3) and the ADA, 42 U.S.C. §12112(d)(3)(c).

145. Washburn & Doughty knowingly and willfully violated Mr. Dinsmore's rights under the ADA and MHRA.

146. Washburn & Doughty unlawfully discriminated against Mr. Dinsmore with malice or reckless indifference to his rights.

147. As a result of Washburn & Doughty's unlawful discrimination and retaliation against Mr. Dinsmore, he has suffered lost wages, lost benefits, loss of enjoyment of life, loss of self-esteem, injury to reputation, injury to career, humiliation, and other pecuniary and non-pecuniary losses.

148. Mr. Dinsmore has no plain, adequate, or complete remedy at law to fully redress the wrongs alleged, and he will continue to suffer irreparable injury from his mistreatment by Washburn & Doughty unless and until Defendant is enjoined by this court.

## COUNT I: ADA
## UNLAWFUL DISCRIMINATION

149. Paragraphs 1-148 are incorporated by reference.

150. Defendant engaged in unlawful disability discrimination in violation of the ADA.

COUNT II: MHRA
UNLAWFUL DISCRIMINATION

151. Paragraphs 1-150 are incorporated by reference.

152. Defendant engaged in unlawful disability discrimination in violation of the MHRA.

COUNT III: ADA
UNLAWFUL USE OF MEDICAL INFORMATION

153. Paragraphs 1-152 are incorporated by reference.

154. Defendant committed multiple violations of the medical examination provision of the ADA.

COUNT IV: MHRA
UNLAWFUL USE OF MEDICAL INFORMATION

155. Paragraphs 1-154 are incorporated by reference.

156. Defendant committed multiple violations of the medical examination provision of the ADA.

PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

a) Enter Judgment in Plaintiff's favor;

b) Declare the conduct engaged in by Defendant to be in violation of his rights;

c) Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate his rights;

d) Order Defendant to employ Plaintiff as a welder or shipfitter or, in the alternative, award Plaintiff front pay and benefits;

e) Award equitable-relief for back pay, benefits and prejudgment interest;

f) Award compensatory damages in an amount to be determined at trial;

g) Award punitive damages in an amount to be determined at trial;

h) Award liquidated damages in an amount to be determined at trial;

i) Award nominal damages;

j) Award attorney's fees, including legal expenses, and costs;

k) Award prejudgment interest;

l) Permanently enjoin Defendant from engaging in any employment practices which discriminate on the basis of disability or retaliation;

m) Require Defendant to mail a letter to all employees notifying them of the verdict and stating that Defendant will not tolerate discrimination or retaliation in the future;

n) Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

o) Require that Defendant train all management level employees on the protections afforded by the MHRA and ADA; and

p) Grant to Plaintiff such other and further relief as may be just and proper.


Dated:  February 4, 2020                    /s/ Chad T. Hansen
                                            chansen@maineemployeerights.com

                                            Attorney for Plaintiff

                                            EMPLOYEE RIGHTS GROUP
                                            92 Exchange Street 2nd floor
                                            Portland, Maine 04101
                                            Tel. (207) 874-0905